## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| VITEC, L.L.C.,<br>individually and on behalf of all others similarly situated,<br>Plaintiff,<br>v.<br><br>Keihin Corporation, Keihin North America, Inc., Maruyasu Industries Co., Ltd., Mikuni Corporation, Mikuni American Corporation,<br><br>Defendants. | Case No.: 18-cv-12858<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## SUMMARY OF THE CASE

Plaintiff VITEC, L.L.C., individually and on behalf of a proposed class of direct purchasers of Fuel Injection Systems, brings this class action against Defendants under the federal antitrust laws for treble damages and alleges as follows.

1.      Beginning at least as early as January 2000, the Defendants—United States and global manufacturers and suppliers of fuel injection systems—violated the antitrust laws by entering into a continuing conspiracy to rig bids and fix, raise, maintain, or stabilize prices of Fuel Injection Systems sold in the United States and elsewhere at supra-competitive levels.  As a result of Defendants' unlawful conduct, Plaintiff and other class members paid artificially inflated prices for Fuel Injection Systems and have suffered antitrust injury to their business or property.

2.      A criminal investigation of price fixing in the motor vehicle parts industry by the U.S. Department of Justice Antitrust Division has resulted in Co-Conspirators Hitachi

Automotive Systems, Ltd., Aisan Industry Co, Ltd., Mitsuba Corporation, and Mitsubishi Corporation being criminally charged and pleading guilty to antitrust violations with respect to Fuel Injection Systems.

3.     Plaintiff brings this action under Section 1 of the Sherman Act, 15 U.S.C. § 1 (the "Sherman Act") and Section 4 of the Clayton Act, 15 U.S.C. § 15 (the "Clayton Act"), and asserts the following allegations on information and belief, except as to those paragraphs that pertain to Plaintiff, which are based upon personal knowledge.

**DEFINITIONS**

4.     A "Fuel Injection System" admits fuel or a fuel/air mixture into engine cylinders, and may include fuel injectors, high pressure pumps, rail assemblies, feed lines, electronic throttle bodies, airflow meters, engine control units, fuel pumps, fuel pump modules, manifold absolute pressure sensors ("MAP Sensors"), pressure regulators, pulsation dampers, electronic throttle motors, purge control valves and other components sold as a unitary system, as part of a broader system, such as an engine management system, or as separate components.

5.     The global market for Fuel Injection Systems has been estimated to be on the order of $47 billion.

6.     The "Class Period" is from at least as early as January 2000 to the present.

**JURISDICTION AND VENUE**

7.     Plaintiff brings this action to recover treble damages, the costs of suit, and reasonable attorneys' fees resulting from Defendants' violations of the Sherman Act, 15 U.S.C. § 1.

8.     This Court has subject matter jurisdiction pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331, 1332(d) and 1337.

9.      Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391 (b), (c) and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside in, are licensed to do business in, are doing business in, had agents in, are found in, or transact business in this District.

10.     The activities of Defendants and the Co-Conspirators were within the flow of, and were intended to and did have a substantial effect on, the interstate commerce of the United States.

11.     This Court has *in personam* jurisdiction over each of the Defendants because, *inter alia,* each Defendant: (a) transacted business throughout the United States, including in this District, (b) manufactured, sold, shipped, and delivered substantial quantities of Fuel Injection Systems throughout the United States, including in this District, (c) had substantial contacts with the United States, including in this District, and (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business throughout the United States, including in this District.

**THE PARTIES**

12.     Plaintiff VITEC, L.L.C., is a Michigan limited liability company with its principal place of business in Michigan.  Plaintiff purchased Fuel Injection Systems directly from one or more of the Defendants or their Co-Conspirators during the Class Period.

3

*The Keihin Defendants*

13.     Defendant Keihin Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan.

14.     Defendant Keihin North America, Inc., is an Indiana corporation with its principal place of business in Anderson, Indiana.  It is owned and controlled by Keihin Corporation.

*The Maruyasu Defendant*

15.     Defendant Maruyasu Industries Co., Ltd. is a Japanese corporation with its principal place of business in Nagoya, Aichi Prefecture, Japan.  During the Class Period, Defendant Maruyasu Industries Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Fuel Injection Systems that were sold and purchased throughout the United States, including in this District.

*The Mikuni Defendants*

16.     Defendant Mikuni Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan.

17.     Defendant Mikuni American Corporation is a California corporation with its principal place of business in Northridge, California.  It is owned and controlled by Mikuni Corporation.

## CO-CONSPIRATORS

*The Aisan Co-Conspirators*

18.     Co-Conspirator Aisan Industry Co., Ltd., is a Japanese corporation with its principal place of business in Obu, Japan.

19.     Co-Conspirator Franklin Precision Industry, Inc., is a Kentucky corporation with its principal place of business in Franklin, Kentucky.  It is owned and controlled by Aisan Industry Co., Ltd.

20.     Co-Conspirator Aisan Corporation of America is an Illinois corporation with its principal place of business in Franklin, Tennessee.  It is owned and controlled by Aisan Industry Co., Ltd.

21.     Co-Conspirator Hyundam Industrial Co., Ltd., is a Korean corporation with its principal place of business in Asan-si, South Korea.  It is owned and controlled by Aisan Industry Co., Ltd.

*The Hitachi Co-Conspirators*

22.     Co-Conspirator Hitachi Automotive Systems, Ltd., is a Japanese corporation with its principal place of business in Tokyo, Japan.

23.     Co-Conspirator Hitachi Automotive Systems Americas, Inc., is a Delaware corporation with its principal place of business in Harrodsburg, Kentucky.  It is owned and controlled by Hitachi Automotive Systems, Ltd.

*The Denso Co-Conspirators*

24.     Co-Conspirator Denso Corporation is a Japanese corporation with its principal place of business in Kariya, Japan.

25.     Co-Conspirator Denso International America, Inc., is a Delaware corporation with its principal place of business in Southfield, Michigan.  It is owned and controlled by Denso Corporation.

26.     Co-Conspirator Denso International Korea Corporation is a Korean corporation with its principal place of business in Uiwang-si, South Korea.  It is owned and controlled by Denso Corporation.

*The Mitsuba Co-Conspirators*

27.     Co-Conspirator Mitsuba Corporation is a Japanese corporation with its principal place of business in Gunma, Japan.

28.     Co-Conspirator American Mitsuba Corporation is an Illinois corporation with its principal place of business in Novi, Michigan.  It is owned and controlled by Mitsuba Corporation.

*The Mitsubishi Co-Conspirators*

29.     Co-Conspirator Mitsubishi Electric Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan.

30.     Co-Conspirator Mitsubishi Electric US Holdings, Inc., is a Delaware corporation with its principal place of business in Cypress, California.  It is owned and controlled by Mitsubishi Electric Corporation.

31.     Co-Conspirator Mitsubishi Electric Automotive America, Inc., is a Delaware corporation with its principal place of business in Mason, Ohio.  It is owned and controlled by Mitsubishi Electric Corporation.

*The Bosch Co-Conspirators*

32.     Co-Conspirator Robert Bosch GmbH is a privately held German company with its principal place of business in Stuttgart, Germany.

6

33.     Co-Conspirator Robert Bosch LLC is a Delaware limited liability company with its principal place of business in Farmington Hills, Michigan.  It is owned and controlled by Robert Bosch GmbH.

## DEFENDANTS' CO-CONSPIRATORS AND AGENTS

34.     The acts alleged in this Complaint to have been done by Defendants Keihin North America, Inc., and Mikuni American Corporation were authorized, ordered and condoned by their parent companies.

35.     The acts alleged to have been done by the Defendants were authorized, ordered and performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of Defendants' business affairs.

36.     The Co-Conspirators have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof.  The Defendants are jointly and severally liable for the acts of the Co-Conspirators whether or not the Co-Conspirators are named as defendants in this Complaint.

37.     Defendants and the Co-Conspirators acted as the agents of or for the other Defendants and the Co-Conspirators with respect to the acts, violations, and common course of conduct alleged in this Complaint.

## INTERSTATE TRADE AND COMMERCE

38.     The activities of Defendants and the Co-Conspirators, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce.

39.     During the Class Period, Defendants manufactured, sold and shipped substantial quantities of Fuel Injection Systems in a continuous and uninterrupted flow of interstate and foreign commerce.

## FUEL INJECTION SYSTEMS

40.     Fuel Injection Systems manufactured, distributed or sold by Defendants and the Co-Conspirators during the Class Period are not functionally distinguishable from each other in any material respect.

41.     Fuel Injection Systems are installed by motor vehicle original equipment manufacturers ("OEMs") in new motor vehicles as part of the manufacturing process.  They are also installed in motor vehicles to replace worn out, defective, or damaged Fuel Injection Systems.

42.     OEMs include the Big Three in Detroit (General Motors, Ford and Chrysler) and non-domestic companies that also operate manufacturing plants in the U.S.  For example, during the Class Period, Nissan manufactured motor vehicles in Mississippi and Tennessee, Toyota in Kentucky, BMW in South Carolina, Honda in Ohio and Alabama, Hyundai and Mercedes-Benz in Alabama, and Kia in Georgia.  In addition to OEMs, suppliers to OEMs, such as Plaintiff, purchased Fuel Injection Systems directly from Defendants and the Co-Conspirators.

43.     When purchasing Fuel Injection Systems, OEMs issue Requests for Quotation ("RFQs") to motor vehicle parts suppliers.  For automotive OEMs, the bidding process begins approximately three years prior to the start of production of a new model platform.  In response, motor vehicle parts suppliers submit quotations or bids, and the OEM usually awards the business to the selected motor vehicle part supplier for the anticipated production cycle of the platform, usually four to six years.  Japanese OEMs procure parts for U.S.-manufactured motor vehicles both in Japan and in the United States.

44.     Defendants and the Co-Conspirators supplied Fuel Injection Systems to OEMs for installation in motor vehicles manufactured and sold in the United States and elsewhere.  The

Defendants and the Co-Conspirators manufactured Fuel Injection Systems (a) in the United States for installation in motor vehicles manufactured and sold in the United States, (b) in Japan and elsewhere for export to the United States and installation in motor vehicles manufactured and sold in the United States, and (c) in Japan for installation in motor vehicles manufactured in Japan for export to and sale in the United States.

45.     During the Class Period, Defendants and the Co-Conspirators sold Fuel Injection Systems directly to OEMs, suppliers to OEMs, distributors, and other purchasers.

46.     During the Class Period, Defendants, who in a competitive market would be horizontal competitors, engaged in a conspiracy to rig bids for and to raise, fix, maintain, or stabilize prices of Fuel Injection Systems.  As a result of their unlawful conduct, Defendants and the Co-Conspirators did not compete, but instead conducted their business insulated from competition.

## THE CHARACTERISTICS OF THE MARKET
## FOR FUEL INJECTION SYSTEMS ARE CONDUCIVE TO COLLUSION

47.     Several important economic characteristics of the market for Fuel Injection Systems render it plausible that there was collusion among Fuel Injection Systems suppliers.

### *High Barriers to Entry*

48.     A collusive arrangement that raises product prices above competitive levels would, under normal circumstances, attract new entrants seeking to benefit from the supra-competitive pricing.  New entrants would, in turn, decrease the market power of the Defendants and the Co-Conspirators and diminish their ability to successfully maintain supra-competitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely.  Therefore, high barriers to entry help facilitate a cartel.

49.     There are high barriers to entry in the market for Fuel Injection Systems.  Entry requires a company to incur significant start-up capital expenditures.  A new entrant into the business would have to incur millions of dollars in costs, including capital expenditures on plants and equipment, as well as transportation, electricity, infrastructure for distribution, and labor.  A new entrant would also have to have assured relationships with significant customers in order to justify its substantial investments of capital.

*Price Inelasticity*

50.     When a seller of goods or services can increase prices without suffering a substantial reduction in sales, pricing is considered inelastic.  In order for a cartel to profit from raising prices above competitive levels, pricing must be relatively inelastic.  Otherwise, increased prices would result in declining sales, revenues, and profits.

51.     Fuel Injection Systems are required for vehicles that use them; there are no viable substitute products.  Therefore, pricing for Fuel Injection Systems is highly inelastic.

*Opportunities for Collusion*

52.     Defendants and the Co-Conspirators attended industry events that created opportunities to conspire.  Such industry events have provided myriad opportunities to meet, conspire, and share information.

**DEFENDANTS' ANTITRUST CONSPIRACY**

53.     During the Class Period, Defendants and the Co-Conspirators conspired to rig bids for, to allocate the supply of, and to raise, fix and maintain prices for Fuel Injection Systems sold in or into the United States.

54.     Defendants and the Co-Conspirators engaged in anticompetitive conduct in furtherance of the alleged conspiracy, as described below.

55.     Defendants and the Co-Conspirators participated in meetings, conversations, and communications in the United States, Germany and Japan to discuss bids and price quotations for Fuel Injection Systems sold in or into the United States.

56.     Defendants and the Co-Conspirators agreed during those meetings, conversations, and communications to allocate among themselves the supply of Fuel Injection Systems sold in or into the United States.

57.     Defendants and the Co-Conspirators sold Fuel Injection Systems to customers in the United States and elsewhere at collusive and non-competitive prices.

58.     Defendants and the Co-Conspirators accepted payments for Fuel Injection Systems sold in the United States and elsewhere at collusive and non-competitive prices.

59.     Defendants and the Co-Conspirators agreed during meetings, conversations, and communications to coordinate price adjustments requested by motor vehicle manufacturers.

60.     Defendants and the Co-Conspirators submitted bids, price quotations, and price adjustments to motor vehicle manufacturers in the United States and elsewhere in accordance with their conspiratorial agreements.

61.     Defendants and the Co-Conspirators held meetings and conversations to monitor and police their bid-rigging and price-fixing conspiracy.

62.     Defendants and the Co-Conspirators affirmatively undertook measures to conceal their unlawful conduct.

63.     Defendants accomplished their conspiracy, in part, by rigging bids they made in response to RFQs.

64.     The RFQ process is designed to obtain independent bids from multiple suppliers. The OEM RFQ process generally works as follows: (1) the OEM issues the RFQ to multiple

parts suppliers; (2) the suppliers submit bids; (3) depending on the OEM and product, the OEM and suppliers may revise the technical specifications and the pricing; (4) the suppliers submit revised bids; and (5) the OEM selects the winner.

65.     Generally, RFQ contracts are awarded to suppliers that submit the lowest bids and last for the life of a vehicle model (approximately five years).

66.     When OEMs purchase Fuel Injection Systems directly from the supplier to whom they awarded the contract, the OEMs purchase the Fuel Injection Systems at the winning price.

67.     That winning price is also used when OEM suppliers that were not part of the RFQ process purchase Fuel Injection Systems directly from the winning bidder for incorporation into products manufactured for and sold to OEMs.  Those suppliers and other direct purchasers who directly purchase Fuel Injection Systems from the winning bidder pay the winning bidder at least the winning price.  The OEM price sets the floor for pricing of Fuel Injection Systems.

68.     Defendants' and the Co-Conspirators conduct persisted for at least eleven years (2000-2011).  Had governmental authorities in the United States and abroad not launched an antitrust investigation into anticompetitive conduct in the market for motor vehicle parts, it is likely that the conspiracy would have continued undetected.

69.     Defendants and the Co-Conspirators manipulated the RFQ process to accomplish their conspiracy.

70.     As part of their conspiracy, at times Defendants and the Co-Conspirators agreed to submit bids that would allow the supplier that had the existing Fuel Injection Systems business for a particular model to win the Fuel Injection Systems business for the successor model.

71.     Defendants and the Co-Conspirators coordinated their Fuel Injection Systems pricing.  They submitted responses to RFQs that incorporated changes to pricing based on the

conspiratorial agreements they made with each other. Defendants and the Co-Conspirators exchanged pricing information not just to ensure that the agreed-upon party would win the business, but also to ensure that the losing bidders would look competitive in order to have the opportunity to bid for future business.

72.   Defendants and the Co-Conspirators communicated, held meetings, and reached conspiratorial agreements in furtherance of their price-fixing conspiracy. Defendants' activities included, but were not limited to, the following:

a.   Agreeing to unlawfully coordinate pricing for, and allocate sales of, Fuel Injection Systems. For example, in responding to RFQs, Defendants and the Co-Conspirators agreed that the incumbent supplier would be the preferred bidder, and to price their bids to effect this agreement.

b.   Colluding with regard to RFQs for Fuel Injection Systems business by agreeing on pricing and then communicating agreed-upon prices to Defendants' and the Co-Conspirators' subsidiaries in the U.S., where the prices were submitted collusively.

c.   Discussing and exchanging pricing information with regard to Fuel Injection Systems RFQs and reaching conspiratorial agreements with respect to RFQs by means of communications on multiple occasions to coordinate responses and exchanges and adjustments of Fuel Injection Systems pricing before submission to OEMs in the United States and elsewhere.

d.   Defendant Keihin met with Co-Conspirators Denso and Hitachi to discuss the submission of bids for fuel injection systems to Honda. They agreed to allocate the business based on geographic region and exchanged quotes for the purpose of submitting bids that would accomplish this agreement.

e.      Defendant Mikuni met with Co-Conspirator Denso to discuss the submission of bids to Mitsubishi Motors Corporation for the purpose of increasing prices for fuel injection systems and exchanged quotes for the purpose of accomplishing this agreement.

f.      Defendant Maruyasu met with Co-Conspirator Denso to discuss the submission of bids to Toyota for fuel injection systems.  They agreed to share the business with Toyota and exchanged quotes for the purpose of submitting bids that would enable them to be low bidder for the fuel injection systems they had agreed to allocate between themselves.

73.    Defendants and the Co-Conspirators knew and intended that their actions regarding their sales of Fuel Injection Systems to motor vehicle manufacturers would have a direct impact on prices for Fuel Injection Systems sold to all direct purchasers in the United States.

74.    Defendants' single price-fixing conspiracy involving Fuel Injection Systems impacted not only multiple bids submitted to OEMs, but also the prices paid by all other direct purchasers of Fuel Injection Systems.

## UNITED STATES CRIMINAL CHARGES

75.    On September 26, 2013, the DOJ charged Co-Conspirator Hitachi Automotive Systems, Ltd., with participating in a "combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate the supply of, rig bids for, and fix, stabilize, and maintain the prices of, certain automotive products sold to automobile manufacturers in the United States and elsewhere," in violation of the Sherman Act.  The criminal information defined "automotive parts" to include Fuel Injection Systems.

76.     According to the criminal information, Hitachi and its co-conspirators:

a.     participated in meetings, conversations, and communications in the United States and elsewhere to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

b.     agreed, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

c.     agreed, during those meetings, conversations, and communications, to allocate the supply of automotive parts (including Fuel Injection Systems) sold to automobile manufacturers in the United States and elsewhere;

d.     agreed, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

e.     submitted certain bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

f.     sold automotive parts (including Fuel Injection Systems) to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

g.     accepted payment for automotive parts (including Fuel Injection Systems) sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

15

h.      engaged in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

i.      employed measures to keep their conduct secret, including, but not limited to, using code names and meeting at remote locations.

77.     On November 6, 2013, a Plea Agreement executed by the DOJ and Hitachi Automotive Systems, Ltd., was filed in the United States District Court for the Eastern District of Michigan.  In the Plea Agreement Hitachi agreed to pay a $195 million criminal fine and plead guilty to a one-count criminal information charging it with engaging in "a combination and conspiracy to suppress and eliminate competition in the automotive parts industry"—with "automotive parts" defined to include Fuel Injection Systems—"by agreeing to allocate the supply of, rig bids for, and fix, stabilize, and maintain the prices of, certain automotive products sold to automobile manufacturers in the United States and elsewhere," in violation of the Sherman Act.

78.     In addition to the criminal fine, Hitachi Automotive Systems, Ltd. has agreed that it and its subsidiaries will cooperate in the DOJ's ongoing criminal investigation.

79.     The Plea Agreement states that "automotive parts [defined to include Fuel Injection Systems] that were subject of the conspiracy were sold to Nissan, Honda, GM, Ford, Toyota, and others, and certain of their subsidiaries, affiliates and suppliers in the U.S. and elsewhere, by the defendant's affiliate, Hitachi Automotive Systems Americas, Inc., which is located in the Eastern District of Michigan."

80.     On September 18, 2014, the DOJ charged four Hitachi Automotive Systems, Ltd., employees with criminal violations of the Sherman Act in relation to the same conduct that underpins the company's Plea Agreement.

81.     Hitachi employees obstructed the DOJ's investigation into the company's criminal conduct.  The Hitachi plea agreement states that when "certain employees of [Hitachi] became aware of a criminal antitrust investigation" in 2010, Hitachi employees "took steps to destroy evidence of [Hitachi's] criminal activity . . . ."  Then in 2011, when Hitachi employees learned that the company was being raided by law enforcement authorities, "certain employees of [Hitachi] took steps to destroy evidence" of the company's criminal activity "to prevent its discovery by law enforcement authorities."  The plea agreement further states that "[c]ertain employees involved in the efforts to destroy evidence were senior managers of [Hitachi]."

82.     Co-Conspirator Denso Corporation, one of the world's leading Fuel Injection Systems manufacturers, has pleaded guilty to a two-count criminal information and paid a total of $78 million in criminal fines.  Denso Corporation was charged with: (1) participating in a combination and conspiracy to suppress and eliminate competition in the motor vehicle parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, electronic control units sold to a motor vehicle manufacturer in the United States and elsewhere, starting at least as early as January 2000 and continuing until at least February 2010, in violation of Section 1 of the Sherman Act; and (2) participating in a combination and conspiracy to suppress and eliminate competition in the motor vehicle parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, heater control units sold to a motor vehicle manufacturer in the United States and elsewhere starting at least as early as January 2000 and continuing until at least February 2010, also in violation of the Section 1 of the Sherman Act.

83.    On January 31, 2012, Denso Corporation issued a news release stating that "to emphasize the seriousness of these matters, Denso chairman, president and certain board members and executive directors will voluntarily return 30 percent to 10 percent of their compensation for a three-month period starting in February 2012."

84.    On August 20, 2014, the National Development and Reform Commission of China announced that it had decided to impose monetary sanctions on certain automotive suppliers, including Denso Corporation, for violation of China's Anti-Monopoly Law in connection with sales of "certain automotive components."

85.    On August 21, 2014, Denso Corporation announced that it had been fined by the Ontario Superior Court of Justice for violation of the Canadian Competition Act in connection with sales in Canada of certain body electronic control units for motor vehicles.

86.    On March 26, 2015, the South Korea Fair Trade Commission fined Denso Corporation and its Korean subsidiary $1.23 million for rigging bids on exhaust gas temperature sensors.

87.    Co-Conspirator Aisan Industry Co, Ltd. has agreed to plead guilty to violating the Sherman Act and to pay a $6.86 million criminal fine for anti-competitive actions in the market for automotive parts—including Fuel Injection System components electronic throttle bodies and fuel pump modules—sold in the United States between 2003 and 2010.

88.    Co-Conspirator Mitsuba Corporation has agreed to plead guilty to violating the Sherman Act and to pay a $135 million criminal fine for anti-competitive actions in the market for automotive parts—including Fuel Injection System components electronic throttle motors and fuel pumps—sold in the United States between 2000 and 2010.

89.     Former Mitsuba executives Hiroyuki Komiya and Hirofumi Nakayama have been charged by the DOJ with fixing the prices of automotive parts and persuading or attempting to persuade Mitsuba employees to destroy documents and data that may contain evidence of antitrust crimes in the United States.

90.     DOJ has also charged that Mitsuba Corporation obstructed justice:

> In or about February 2010, Executive A, acting on Defendant's [Mitsuba's] behalf, knowingly altered, destroyed, mutilated, concealed, covered up, falsified and made false entries in records, documents and tangible objects with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States, to wit, an investigation by the FBI and the United States Department of Justice of possible violations of U.S. antitrust law, in relation to and contemplation of such matter and case, and furthermore did order and command other employees of the Defendant to do so, in violation of 18 U.S.C. § 1519.

> After becoming aware of the FBI search of Defendant's co-conspirator's U.S. offices, Executive A informed certain of his subordinates employed at the U.S. subsidiary of Defendant about the FBI search, and instructed such subordinates, as well as other employees of Defendant, to locate, conceal and destroy documents and electronic files that were likely to contain evidence of antitrust crimes in the United States and elsewhere.

> Executive A concealed and destroyed documents and electronic files in his possession, custody and control in the Eastern District of Michigan that were likely to contain evidence of antitrust crimes in the United States and elsewhere. Certain of Executive A's subordinates and other employees of Defendant took acts in the Eastern District of Michigan and elsewhere to endeavor to conceal and destroy such documents and electronic files in the possession, custody and control of Defendant, and did conceal and destroy such documents and electronic files.

91.     Co-Conspirator Mitsubishi Corporation has agreed to plead guilty to violating the Sherman Act and to pay a $190 million criminal fine for anti-competitive actions in the market for automotive parts—including Fuel Injection System components fuel injectors, fuel pumps, MAP sensors, purge control valves, and throttle bodies—sold in the United States between 2000 and 2010.

92.     Mitsubishi executives Atsushi Ueda, Minoru Kurisaki, and Hideyuki Saito have been charged by the DOJ with conspiring to fix automotive part prices; Kurisaki and Saito have been charged with conspiring to obstruct justice by destroying documents; and Saito has been charged with persuading or attempting to persuade others to destroy documents and data that may contain evidence of antitrust crimes in the United States.

93.     Co-Conspirator Bosch agreed to plead guilty to violations of the Sherman Antitrust Act in the sale of automobile parts and to pay a criminal fine of $57.8 million.  Under the terms of its plea agreement, Bosch admitted that within the Class Period it had "participated in a conspiracy with other persons and entities engaged in the manufacture and sale of spark plugs, oxygen sensors, and starter motors, as defined above, the primary purpose of which was to allocate the supply of, rig bids for, and to fix, stabilize, and maintain the prices of, spark plugs, oxygen sensors, and starter motors sold in the United States and elsewhere."  Bosch admitted that in furtherance of the conspiracy its employees had participated in meetings and conversations where agreements were reached (*inter alia*) "to allocate the supply of starter motors, rig bids for the sale of starter motors, and to fix, stabilize, and maintain the prices of, starter motors sold to Volkswagen AG and certain of its subsidiaries in the United States for use in certain Volkswagen vehicles assembled in the United States."

94.     On June 15, 2016, the DOJ announced that a federal grand jury sitting in the U.S. District Court for the Southern District of Ohio returned an Indictment charging Defendants Maruyasu Industries Co., Ltd. and its U.S. subsidiary Curtis-Maruyasu America, Inc. and four executives with conspiring to fix prices, allocate customers, and rig bids for automotive steel tubes sold in the United States and elsewhere from at least as early as December 2003 until at least July 9, 2011 in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

95.     On May 31, 2018, the DOJ announced that Maruyasu Industries Co., Ltd. pled guilty and was sentenced to pay a $12 million criminal fine for its role in a criminal conspiracy to fix prices, rig bids, and allocate customers for automotive steel tubes sold to automobile manufacturers in Japan and incorporated into vehicles sold in the United States in violation of Section 1 of the Sherman Act.  Concurrent with the Court's imposition of the sentence against Maruyasu Industries Co., Ltd., the DOJ moved to dismiss the indictment as to Curtis-Maruyasu America, Inc. and three of the four charged executives.

## CLASS ACTION ALLEGATIONS

96.     Plaintiff brings this action on behalf of itself, and, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), as the representative of a Class defined as follows:

> All direct purchasers of motor vehicle Fuel Injection Systems in the United States from any of the Defendants and the Co-Conspirators (or their controlled subsidiaries, affiliates, or joint-ventures) between at least as early as January 2000 and the present.

97.     Members of the Class are so numerous and geographically dispersed across the United States that joinder is impracticable.   While the exact number of Class members is unknown to Plaintiff, it is believed to be in the hundreds.  The identity of the members of the Class can be readily determined from information and records Defendants possess.

98.     Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and all members of the Class were damaged by the same wrongful conduct by Defendants, *i.e.*, they have paid artificially inflated prices for Fuel Injection Systems as a result of Defendants' anticompetitive and unlawful conduct.

99.     Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

100.    Plaintiff is represented by counsel experienced and competent in the prosecution of antitrust class action litigation.

101.    Questions of law and fact common to members of the Class predominate over questions that may affect only individual Class members, because Defendants have acted on grounds generally applicable to the entire Class.  Such generally applicable conduct is inherent in Defendants' anticompetitive and unlawful conduct.

102.    There are core questions of law and fact common to the Class, such as:

a.      Whether Defendants conspired to fix, raise, maintain, or stabilize prices of, to allocate, or to rig bids for, Fuel Injection Systems;

b.      Who participated in the conspiracy and how long it lasted;

c.      Whether the conspiracy caused Fuel Injection Systems prices to be higher than they otherwise would have been;

d.      Whether Defendants' conduct caused injury to the business or property of Plaintiff and members of the Class;

e.      Whether Defendants' conduct violated Section 1 of the Sherman Act;

f.      Whether Defendants undertook actions to conceal their unlawful conspiracy; and

g.      How to measure the damages suffered by the Class.

103.    A class action is superior to the other methods available for the fair and efficient adjudication of this litigation because individual joinder of all Class members is impracticable. Individual litigation presents the potential for inconsistent judgments and would greatly increase the cost and duration of litigation for all parties and for the judicial system.  A class action

permits more efficient case management and offers the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

### ANTITRUST INJURY SUFFERED BY PLAINTIFF AND THE CLASS

104.   Defendants' anticompetitive conduct has had the following effects:

a.   price competition has been restrained, suppressed, or eliminated with respect to Fuel Injection Systems;

b.   the prices of Fuel Injection Systems have been raised, fixed, maintained, or stabilized at supra-competitive levels; and

c.   purchasers of Fuel Injection Systems have been deprived of free and open competition in the Fuel Injection Systems market.

105.   As a result of Defendants' contract, combination, or conspiracy, Plaintiff and Class members paid higher prices for Fuel Injection Systems than they would have in the absence of the conspiracy, and Plaintiff and Class members have sustained injury to their business or property.

### PLAINTIFF'S CLAIMS ARE TIMELY

106.   Plaintiff and the members of the Class had no knowledge that the Defendants were engaged in anticompetitive conduct alleged herein, or of facts sufficient to place them on notice of the claims set forth herein against the Defendants, more than four years prior to the filing of this complaint.  As a result, Plaintiff and the members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the Defendants' participation in the conspiracy alleged herein, more than four years prior to the filing of this complaint.

107.    Further, fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiff and the Class against the Defendants until at least four years prior to the filing of this complaint.  Defendants affirmatively and wrongfully concealed anticompetitive conduct from Plaintiff and the Class from at least as early as January 2000. During that time, Plaintiff and the Class did not learn or discover the operative facts giving rise to the instant Complaint against Defendants.

108.    Before more than four years prior to the filing of this complaint, Plaintiff and members of the Class were unaware of Defendants' unlawful conduct.  No information, actual or constructive, was ever made available to Plaintiff and the members of the Class that would have suggested to Plaintiff that it was being injured by Defendants' unlawful conduct.

109.    The affirmative acts by the Defendants alleged herein were wrongfully concealed and carried out in a manner that precluded detection.

110.    By its very nature, Defendants' anti-competitive conspiracy was inherently self-concealing.  Because Fuel Injection Systems are not exempt from antitrust regulation, Plaintiff and the Class reasonably believed that the market for Fuel Injection Systems was competitive.

111.    Defendants represented publicly that their pricing and bidding activities were unilateral, rather than being based on anticompetitive agreements.  In making those false representations, Defendants misled Plaintiff and the Class as to the true, collusive, and coordinated nature of their bid-rigging, customer-allocation, and price-fixing activities.

112.    Defendants' wrongful conduct was carried out in part through means and methods that were designed to prevent detection, and which for a long time succeeded in preventing detection.

24

113.   In particular, Defendants participated in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to customers in the United States and elsewhere.

114.   During these meetings, conversations, and communications, Defendants agreed upon bids and price quotations to be submitted to customers in the United States and elsewhere.

115.   Defendants likewise agreed to allocate the supply of Fuel Injection Systems sold to customers in the United States and elsewhere on a model-by-model basis.

116.   Defendants also agreed to coordinate price adjustments requested by customers in the United States and elsewhere.

117.   In accordance with their agreements, Defendants submitted collusive bids, price quotations, and price adjustments to customers in the United States and elsewhere.

118.   Plaintiff and the Class could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and the Co-Conspirators to avoid detection of, and to fraudulently conceal, their conduct.

119.   For these reasons, the statute of limitations applicable to Plaintiff's and the Class's claims was tolled and did not begin to run until less than four years prior to the filing of this complaint.

## COUNT I
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

120.   Plaintiff incorporates by reference the allegations set forth above as if fully set forth here.

121.   Defendants entered into and engaged in a contract, combination, or conspiracy in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

122.    The acts done by each of the Defendants as part of, and in furtherance of, the contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

123.    Commencing at least as early as January 2000 and continuing until the present, the exact dates being currently unknown to Plaintiff, Defendants entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, or maintain prices for Fuel Injection Systems, creating anticompetitive effects.

124.    Defendants' anticompetitive acts were intentionally directed at the United States market and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Fuel Injection Systems throughout the United States.

125.    As a result of the conspiracy alleged herein, the prices charged to Plaintiff and the other members of the Class for Fuel Injection Systems were unlawfully raised, fixed, maintained, or stabilized in the United States.

126.    The conspiracy has had the following effects:

a.      prices paid by Plaintiff and the Class for Fuel Injection Systems were raised to, or fixed, maintained, or stabilized at, non-competitive levels;

b.      Plaintiff and the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for Fuel Injection Systems; and

c.      competition in the market for Fuel Injection Systems has been unlawfully restrained, suppressed, or eliminated.

127.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the Class have been damaged, and will continue to be damaged, by paying supra-competitive

prices that they would not have had to pay in the absence of the unlawful conduct of Defendants as alleged herein.

128.    The conspiracy is a per se violation of the federal antitrust laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment on its behalf and on behalf of the Class herein, and respectfully requests the following relief:

A.    That the Court determine that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiff as the designated Class representative and its counsel as Class Counsel;

B.    That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and the Co-Conspirators as alleged in this complaint, be adjudicated and decreed a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.    That Plaintiff and the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against the Defendants in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. § 15(a);

D.    That Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

E.    That Plaintiff and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

F.       That Plaintiff and the Class be awarded pre-judgment and post-judgment interest in accordance with law; and

G.       That Plaintiff and the Class receive such other or further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues so triable.

Dated:  September 13, 2018

/s/ David H. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
Nathan J. Fink (P75185)
FINK + ASSOCIATES LAW
38500 Woodward Ave; Ste. 350
Bloomfield Hills, MI 48304
Telephone: (248) 971-2500
dfink@finkandassociateslaw.com
nfink@finkandassociateslaw.com

Gregory P. Hansel
Randall B. Weill
Michael S. Smith
PRETI, FLAHERTY, BELIVEAU
   & PACHIOS LLP
One City Center
P.O. Box 9546
Portland, ME 04112-9546
Telephone: (207) 791-3000
ghansel@preti.com
msmith@preti.com

Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
KOHN, SWIFT & GRAF, P.C.
1600 Market Street; Suite 2500
Philadelphia, PA 19107
Telephone: (215) 238-1700
jkohn@kohnswift.com
whoese@kohnswift.com
dabrahams@kohnswift.com

Steven A. Kanner
William H. London
Michael E. Moskovitz
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
skanner@fklmlaw.com
wlondon@fklmlaw.com
mmoskovitz@fklmlaw.com

Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
Jeffrey L. Spector
SPECTOR ROSEMAN &
    KODROFF, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
espector@srkw-law.com
bcaldes@srkw-law.com
jjagher@srkw-law.com
jspector@srkw-law.com

*Interim Co-Lead Counsel for Plaintiff VITEC,
L.L.C.  and the Proposed Class*

Carl E. Person
225 E. 36th Street – Suite 3A
New York, N.Y. 10016-3664
Telephone: (212) 307- 4444
carlpers2@gmail.com

Irwin B. Levin
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
ilevin@cohenandmalad.com

Manuel J. Dominguez
COHEN MILSTEIN
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
Telephone: (877) 515-7955
jdominguez@cohenmilstein.com

Solomon B. Cera
CERA LLP
595 Market St., Suite 2300
San Francisco, CA 94105
Telephone: (415) 777-5189
scera@cerallp.com

*Additional Counsel for Plaintiff VITEC, L.L.C.
and the Proposed Class*